WATERTOWN STEAM ENGINE COMPANY v. JAMES B. DAVIS.

Conditional sales of personal property are valid in this State; and where delivery of property is made upon agreement that no title shall pass until payment is made or some thing is done or occurs, no title passes to the party to whom it is delivered until such payment is made or such thing is done or occurs, and he can pass none to his vendee, no matter how ignorant of the contract such vendee may be.

If such property consists of machinery and is placed by the purchaser permanently on his land, yet if its identity can be shown to be that of the property bargained for, the conditional vendor on failure of payment can enter on the premises and remove it and repossess himself of it, provided such be the bargain between the parties; and he can recover a reasonable compensation for the use thereof if such also be the bargain.

Bargains and sales made by an agent of a manufacturing company within the scope of his authority bind the company, but if a special agency existed by which he was restricted to a certain mode of dealing, it would not bind the purchaser unless it was communicated to him before he erected the machinery on his freehold.

Knowledge of any such special agency or conditional bargain and sale of machinery by the company to a purchaser who erects it on lands bound by a mortgage recorded before the machinery went upon the premises, on the part of the mortgagee, cannot affect the lien of his mortgage upon the machinery if it has thereby become a fixture of the premises bound by it, unless it can be shown that the mortgagee agreed that it should be exempted from it, or so conducted himself with respect to the matter as to mislead and deceive the company into the belief that it would not bind it, for in that case he would have been guilty of a fraud, which the law would not tolerate.

THIS was an action of trover for a horse-power stationary engine complete, and an iron frame saw-mill with all the fixtures and appurtenances thereunto belonging, sold through an agent of the company which manufactures them in the State of New York, Mr. George S. Grier, of the town of Milford, in this State, to Mr. Soloman Holmes, of that place. The terms and conditions of the sale were embraced in the following receipt of Holmes, dated March 24th, 1873, and witnessed by the agent, Grier, and another : " Received of the Watertown Steam Engine Company one twenty horse-power stationary engine complete, and one No. 3 iron frame saw-mill, with all the fixtures and appurtenances thereunto belonging, delivered to me this day

under a bargain for the sale thereof, and for which I have given my notes for thirteen hundred and seventy-five dollars, payable at the office of discount and deposit of the Smyrna Bank, in Milford, Kent County and State of Delaware, with interest. And it is expressly understood that the said Watertown Steam Engine Company neither parts with, nor does Solomon Holmes acquire, any title to said property until said notes and all extensions and renewals thereof are fully paid.   And it is expressly understood that Soloman Holmes is not to remove said property from his premises in Milford, Delaware, without the consent of the said Watertown Steam Engine Company; and in case of default in the payment of the said notes at maturity or any of the payments thereon, with interest, the said Watertown Steam Engine Company are authorized to enter his premises and take and remove said property and collect reasonable charges for the use of the same."

The engine and saw-mill had been ordered by the agent, Grier, in the month of September preceding and had been delivered to Holmes by him in Milford, at the price of two thousand four hundred and seventy-five dollars, five hundred dollars of it to be paid in cash on the delivery of them to him, and the balance in four notes at three, six, nine, and twelve months respectively. Holmes at once proceeded to erect them on a lot in the town which he had previously purchased of James B. Davis for the purpose on credit, securing the purchase-money to him by a mortgage upon it.   But when the notes of Holmes were transmitted by Grier to the company they were not satisfied with them, as they expected him to take the notes to his own order and indorse them to the company, which he declined to do, and they afterward took from him the receipt above stated for the balance with the written terms and conditions of sale as expressed in it.

There was a granary on the lot when Holmes bought it of Davis which he converted into a grist-mill to be run with the saw-mill by the steam engine, the engine being placed on a bed-piece twelve inches below the surface of the earth through which large upright iron rods or bolts were run with taps on the lower and screws on the upper ends, and around them brick

pillars were constructed, on which it was securely fastened by taps over the screws, but from which the engine could at any time be removed by unscrewing them without disturbing the bed-piece or brick pillars on which it rested. The foundation on which the boiler was placed was the same, except that it was made a little higher. The surface of the earth was leveled off carefully, on which stringers were laid lengthwise across sleepers placed on the ground, and upon that the carriage of the saw-mill was laid and worked, and the only excavation which it required in the earth was the open pit over which the circular saw revolved and into which the sawdust fell.

The first note, which was for five hundred dollars, was afterward paid by Holmes, but the others were never paid, and two years afterward Holmes died insolvent, and Davis afterward sued out a *levari facias* on his mortgage on which he sold the lot and premises, and of which he became the purchaser at the sheriff's sale ; subsequently Grier recovered a judgment against Holmes on which he sued out a *fi. fa.* execution, had it levied on the saw-mill and steam engine as the personal property of Holmes, and bought them at the sheriff's sale, but both the company and Davis forbade publicly the sheriff's sale of them, each claiming to be the owner of them and denying that they belonged to Holmes' estate, but Grier never attempted to take possession of them under his purchase.    It was also proved on the trial that Davis was aware from the first of the terms and conditions on which the company had sold them to Holmes and that Holmes had failed to comply with the terms and conditions of the sale.   The same were afterward demanded by them from Davis, and on his refusal to deliver them this action of trover was brought to recover for the conversion of them.

*Robinson,* for the plaintiffs : The case involves a question of law which has never been decided in the courts of this State. This was a conditional sale of the goods in question (a stationary steam engine and the machinery belonging to it), sold by the plaintiffs to Solomon Holmes on the special terms clearly expressed in it, and as such it was a valid sale, even as against a subsequent *bona fide* purchaser of the goods without notice of the

condition. *Benjamin on Sales, sec.* 320 ; *Story on Sales, sec.* 313 ; *Myers* v. *Solsby,* 2 *Mod.* 242 ; 2 *Kent Com.* 380 ; *Barlow* v. *Cole,* 3 *Campb.* 91 ; *Barrett* v. *Prichard,* 2 *Pick.* 512 ; *Hussey* v. *Thornton,* 4 *Mass.* 404 ; *Ire* v. *Bartlett,* 6 *Pick.* 71 ; *Reed* v. *Upham,* 10 *Pick.* 522 ; *Witwell* v. *Vincent,* 4 *Pick.* 449 ; *Sargent* v. *Metcalf,* 5 *Gray,* 306 ; *Strong* v. *Taylor,* 2 *Hill,* 326 ; *Brewster* v. *Baker,* 20 *Barb.* 364 ; *Ford* v. *Marsh,* 15 *Conn.* 397 ; *Park* v. *Carpenter,* 24 *Conn.* 426 ; *Hotchkiss* v. *Hunt,* 49 *Maine* 213 ; *Smith* v. *Foster,* 18 *Vt.* 182 ; *Clark* v. *Wells,* 45 *Vt.* 4 ; *Duncan* v. *Doan,* 45 *Vt.* 118 ; *Paris* v. *Robbins,* 12 *Ired.* 268 ; 27 *Missouri* 45 ; *Little* v. *Page,* 44 *Missouri* 412 ; *Hunter* v. *Wainer,* 1 *Wis.* 141 ; *Williams* v. *Connoway,* 3 *Houst.* 63. In all sales, except in market overt, it is incumbent upon the vendee of the goods to see that the vendor has a good title to them. *Lesleman* v. *Mackin,* 3 *E. C. L. Rep.* 359. But in this case it is clearly proved that the defendant had notice of the conditional terms on which the engine in question was sold to Holmes by the plaintiffs when he, the defendant, bought it. The character which personal property is to have when fixed to and upon land depends upon the intention of the parties owning the chattel and owning the land with respect to it, and may be determined by agreement between them. *Wood* v. *Huey,* 55 *E. C. L. Rep.* 913 ; 2 *Smith's Ld. Ca.* 219, 221, 222, 223. And actual notice to the subsequent purchaser of the land of the right of the vendor of the chattel to sever it from the land on a breach of the condition of the sale will bind him, notwithstanding it has been so affixed to the freehold as to become a fixture in law, but for the conditional sale of it in such case, because it matters not what may be the nature of its attachment or annexation to the soil, it does not become a fixture in law if by the agreement between the owner of the chattel and the owner of the soil the owner of the chattel shall have the right to sever and remove it from the soil. *Doty* v. *Warren,* 5 *Pick.* 487 ; *Smith* v. *Benson,* 1 *Hill* 176 ; *Goddard* v. *Gould,* 14 *Barb.* 662 ; *Haven* v. *Emory,* 33 *N. H.* 66 ; *Wade* v. *Johnston,* 25 *Gray* 331. The rule of the common law is that where the article in question can be removed without essential injury to the freehold it is not a part of the freehold. *Dane* v. *Dane,* 38 *N. H.* 439 ; *Coleman* v. *Lewis,* 27 *Penna.* 291 ; *Meigs'*

*Appeal,* 62 *Penna.* 28 ; *Hilborn* v. *Brown,* 12 *Maine* 162 ; 26 *Iowa* 156. In this State a mortgagee out of possession of the premises is not the owner of the land, but only the holder of a lien upon it. *Doe d. Hall* v. *Tunnell,* 1 *Houst.* 320. And such lien does not bind any personal property annexed or attached to the land not deemed in law fixtures, and as such parts of the reality. 46 *Barb.* 242. And no subsequent mortgagee or purchaser of the land with notice that such personal property was affixed to it with the right reserved to the owner of it to remove it from the land will take any title to it. *Hill* v. *Semale,* 53 *Penna.* 71 ; 10 *Kans.* 314. And none of these decisions are inconsistent with the case of *Rice* v. *Adams,* 4 *Harr.* 332.

*Lofland,* for the defendant : The extreme doctrine as to conditional sales contended for on the other side has never been recognized as law in this State. On the contrary, the true doctrine, as has been ruled in some of the other States, we hold to be this : if goods be sold and delivered to the purchaser, notwithstanding it is on the condition that the purchaser shall give the vendor a note with security for them on the following Monday, and on that being done the goods to be the property of the purchaser, it is not a conditional, but an absolute sale of them. *Brundage* v. *Camp,* 21 *Ill.* 330. And this is upon the ground that where one of two innocent persons must suffer loss in such a case the loss should fall on the one who by his imprudence has put it in the power of a third person thereby to defraud the other. *Harris* v. *Smith,* 5 *Sarg. & Rawle* 20. A purchase which is not explained must be deemed adverse to the vendor and an absolute sale to the vendee. *Dubois* v. *Marshall,* 3 *Dana* 328 ; *Carriway* v. *Wallace,* 2 *Ala.* 542 ; *M. C. R. R. Co.* v. *Phillips,* 50 *Ill.* 191 ; *Jennings* v. *Gage,* 13 *Ill.* 610. The conclusion in these cases is that though the sale of goods may be conditional as between the vendor and vendee, yet when they have been sold and delivered upon a substantial condition afterward to be performed by the purchaser, but not performed by him, which would be the effect of the delivery as between them, nevertheless, if such purchaser sells them to another for a valuable consideration without notice of the condition it will vest the

legal ownership of the goods in such *bona fide* purchaser. All fixtures for the time being belong to the freehold and constitute a part of the realty ; and as between vendor and vendee, mortgagor and mortgagee, the heir and the executor, the rule is the same in reference to them. *Preston* v. *Briggs*, 16 *Vt.* 124. Fixtures erected by the mortgagor on premises previously mortgaged by him will inure to the benefit of the mortgagee. *Burnside* v. *Twitchell*, 43 *N. H.* 390. Fixtures attached to the freehold cannot be sued for as goods sold and delivered. *Lee* v. *Risdon*, 2 *E. C. L. Rep.* 69 ; 12 *N. H.* 205 ; 17 *Vt.* 403. All buildings erected on mortgaged premises which enhance the value of the real estate become a part of it and are bound by the mortgage. *Butler* v. *Page*, 7 *Metc.* 40; *Winslow* v. *Merchants' Ins. Co.*, 4 *Metc.* 306 ; *Sweetzer* v. *Jones*, 35 *Vt.* 317 ; *Snedacre* v. *Warring*, 2 *Ker.* 170 ; *Burnett* v. *Harris*, 20 *Barb.* 407 ; *McKim* v. *Kennedy*, 3 *Md. Ch. Decis.* 186. Fixtures are a part of the freehold whether attached to the land or not, as between the vendor and vendee. *Morchus* v. *Freeman*, 2 *W. & Sar.* 116. The rolls of a rolling mill and the iron plates covering the floor are a part of the freehold. *Pyle* v. *Pennock*, 2 *W. & Sar.* 300. A chattel mortgage, though made prior to a mortgage of the real estate, will not protect fixtures against a vendee of the real estate without notice of it. *Bringhoff* v. *Mulzeebee*, 20 *Iowa* 513. The case cited on the other side from 46 *Barb.* 242, it is admitted has been overruled in the case which shortly afterward followed it, 48 *Barb.* 278. As between mortgagor and mortgagee, a fixture inures to the benefit of the mortgagee where it has been permanently attached to the mortgaged premises. 3 *Stockt.* 30. Property, including machinery, attached to the freehold passes to the mortgagee after foreclosure. 29 *Maine* 115 ; 17 *Ser. & Rawle* 413 ; 12 *Penna.* 304; 19 *Penna.* 71 ; 19 *Barb.* 317 ; 26 *Ala.* 493 ; 15 *Penna.* 504; 43 *Miss.* 349 ; 2 *Wall.* 491. Real fixtures, such as steam engines, etc., put on the premises by the owner and attached to the freehold as a fixed establishment, are a part of the freehold, subject to real estate liens, and are not liable to be seized as chattels ; but not so of trade fixtures set up by tenants for their own use and convenience. *Rice* v. *Adams et. al.*, 4 *Harr.* 332.

The cases cited warranted him in saying that the engine and iron frame saw-mill with their accompanying machinery sold by the plaintiffs to Holmes, the mortgagor of the premises, were put upon them by him as a permanent addition to and betterment of them in the manufacturing and milling business to which he was about to permanently devote them, and that they thereby became a part of the realty and were incorporated with it in his business establishment, and passed with the premises under the sale of them by the sheriff. The intention with which he purchased such machinery, its adaptability to the purposes of such a permanent manufacturing and milling business, and the mode of laying the foundations of it in the ground, and fixing and fastening it to the earth itself to give it all the solidity and durability practicable and so desirable in such a case, all combined to show conclusively that they thereby lost their previous character as chattels and became part and parcel of the real estate sold by the sheriff.

The evidence in the case disclosed the following undisputed facts: That the engine and its appliances were ordered from Watertown, New York, and were received and placed upon the premises by Holmes at Milford in the latter part of February or the 1st of March, 1873 ; that he paid on their delivery five hundred dollars in cash to the plaintiffs and gave them three promissory notes for the balance of the price, amounting in the aggregate to one thousand nine hundred and seventy-five dollars, dated March 1st, 1873, payable to their order in four, eight, and twelve months respectively, and that it was not until the 24th day of March, 1873, that the contract for the conditional sale of them was executed by him, and we therefore contend that the sale and delivery of them was complete, absolute and unconditional on the 1st of March in that year, when Holmes on the receipt of them paid the five hundred dollars in cash and gave the three promissory notes for the balance of the price of them, and that the subsequent contract for the conditional sale of them signed by him on the 24th of that month could not change or alter the character of the transaction. Besides, the notes were not paid at maturity, nor were they renewed, although Holmes lived until after their maturity and

died on the 14th of September, 1874 ; while from that time to the day of the sheriff's sale under the *levari facias* upon the mortgage on the 7th day of April, 1875, no claim or demand whatever was made by or on behalf of the plaintiffs for these fixtures ; for it was not until the 31st day of August, 1875, when the attempt was made to sell them upon a writ of *fieri facias* at the suit of Grier, that the plaintiffs, through their attorney, Mr. Robinson, either set up any claim to them or protested against any sale of them.

*Fisher*, for the defendant : The essential requisites and legal criteria of a fixture are, first, it must be placed upon the soil or ground for the purpose of improving or ornamenting it ; secondly, it must be intended to be permanent, and thirdly, it must be adapted to the mode of improvement for which it is placed in or upon the ground.   Upon the point that the mortgagee has an unquestionable right to the benefit of every permanent improvement or betterment made on the mortgaged premises by the mortgagor, he cited and specially commented on the opinion delivered by *Gibson, C. J.,* in *Voorhis* v. *Freeman,* 2 *W. & S.* 117.   But if the engine, boiler, and other machinery put on the premises in this case were fixtures the plaintiffs could not maintain an action of trover for them even if they had a right to them as such.   The sale and delivery of them by the plaintiffs to Holmes was upon the facts proved a complete, absolute, and unconditional sale, 3 *Dana* 336—because it was perfected before the contract for the conditional sale of them was signed by Holmes.   But suppose it had been a conditional sale upon the terms of the special and written contract signed by him afterward, how long could the plaintiffs be allowed to wait after the maturity and non-payment of the notes by Holmes before proceeding to enforce their right by an action at law, and to reclaim and remove them from the premises as against the mortgagee of the premises or a purchaser of them under the mortgage at a sheriff's sale ?   Could they be permitted to wait for eighteen months until some innocent purchaser, without notice of the conditional sale, or, at least, until some responsible purchaser had thus become the owner of them,

and then bring their action of trover against him and recover the full value of the engine, boiler, and other machinery as property which had all the time been theirs, and not the property of another, to whom they had only sold and delivered them conditionally, and not completely or absolutely? The law could not and would not tolerate such an unreasonable and protracted delay even in such a case.

*Ridgely*, for the plaintiffs : His colleague had relieved him of the necessity of doing anything more than calling the particular attention of the court to the cases cited on the other side, in all of which without a single exception it would be found that the owner of the freehold was also the admitted owner of the chattel or·fixture in dispute in the case. But not one had been produced to controvert or question the soundness of the principle ruled and recognized in several of the cases of high authority cited by his colleague, that possession does not import title although a presumption of title may in general arise from it, and that a conditional sale and delivery of goods, the vendor retaining the legal title to and the paramount right of property in them until the condition is performed pursuant to the terms of the contract of sale, and if not performed by the vendee may reclaim the possession of them from him, is directly and deliberately ruled and established. And the only exception to this rule and principle in England is in the case of goods sold and delivered in market overt. As to the objection taken by the other side on the evidence that the goods were sold and delivered before the contract for the sale and delivery of them was signed by Holmes, that was clearly explained by Grier, who was the agent of the plaintiffs for the sale of their engines in Milford, where he has long resided and is well known, and who as clearly and distinctly testified that his express instructions from his principals, the plaintiffs, always had been never in any case to sell an engine, even on credit for any part of the price of it, without just such a contract for the conditional sale of it as this was, and that Mr. Holmes was well aware that such were his instructions and the extent of his powers as their agent when and before he concluded to order one, and such was their express

understanding and agreement when he ordered the one in question for him, and that he would sign such a contract at the time of receiving it or at any time afterward whenever he should present it to him for his signature, and which had been delayed by himself alone until the day Holmes signed it. Nor could it be supposed by any one that he would have signed it after delivery of it and the giving of the notes if such had not been his previous agreement.

*The Court, Comegys, C. J., charged the jury:* The Watertown Steam Engine Company, the plaintiffs in the action, was a foreign corporation created by the State of New York, and had its place of business at Watertown in that State, which was the manufacture of stationary engines, iron frame saw-mills, and the necessary fixtures and appurtenances thereunto belonging. In the latter part of the year of 1872 or the early part of 1873, Solomon Holmes, now deceased, but then living in Milford, in this county, entered into a negotiation with George S. Grier, one of the witnesses in this case, and then an agent of the said company in this State, for the purchase of a stationary steam engine and iron frame saw-mill and the machinery and fixtures accompanying them; and it was agreed between them that such an engine and saw-mill should be sold to him by the company on his promising to pay for them the sum of two thousand four hundred and seventy-five dollars as follows : five hundred dollars in cash on delivery and the balance in notes, one of which was to be for five hundred dollars at three months, another for a like sum at six months, and the residue in other notes, the longest period for the payment of which was twelve months. Upon this the mill was ordered, and in the latter part of February, 1873, was received and delivered by the agent to which it was consigned by the plaintiffs, and was erected at once for use upon the real estate of the said Holmes, which was a lot of ground he had purchased in fee simple from the defendant, James B. Davis, by a deed duly executed and delivered and bearing date the 1st day of January, 1873. When the money was paid by Holmes to Grier, the agent, does not appear, but the notes bear date respectively the 1st day of

13

March, 1873, and before that time the mill was delivered to the former and erected by him upon the Davis lot. About these facts there seems to be no controversy whatever, and they may therefore be taken to be absolutely true. Grier states in his testimony that he forwarded the money and notes to the plaintiffs, who kept the former, but refused to accept the latter unless he, their agent, would indorse them ; that he declined to do so as to make himself individually liable for them, but did write his name upon the back of them as agent. The plaintiffs refused to accept them in that form, but in lieu of them required Holmes to sign the writing in proof before you, in which he acknowledges the receipt of the articles, the price to be paid for them, the giving his own notes for the balance (one thousand nine hundred and seventy-five dollars) of the purchase-money, and then consents that in case the notes or any of them are not paid at their maturity the company may enter upon his (Holmes') premises, repossess themselves of the mill, etc., and that he will pay them a reasonable price or sum for such use of them as he has made. This, we think, may be fairly assumed to be true also. We see no reason to doubt the correctness of this part of Grier's testimony, and the writing is before you, is unambiguous in its terms, and speaks for itself. It is also an undisputed fact that the first of the notes was paid when it fell due— thus passing into the plaintiffs' hands, with what was at the time of the delivery of the goods paid in cash, one thousand dollars of the purchase price and reducing the indebtedness to the sum of one thousand four hundred and seventy-five dollars with interest added. The other notes matured in due time, the latest on the 1st and 4th of March, 1874, and were none of them paid. On the 18th day of September following, near seven months thereafter, Holmes died, the owner still of the lot purchased from Davis upon which the mill had been erected, and afterward letters of administration upon his estate were granted by the register of Kent County to D. O. K. Strong (Dr. Strong, as he was called), a witness on the part of the plaintiffs. After the grant of administration the administrator hired the mill to parties and collected the rent thereof until he ceased to have any interest in the matter, which was after the sheriff's sale of the

premises now to be spoken of. This sale was made on the 7th day of April, 1875, by Peter L. Cooper, Esq., then sheriff of said county of Kent, by virtue of a writ of *levari facias* in his hands at the suit of the defendant, James B. Davis, from whom Holmes had, as before stated, purchased the lot upon which the mill was erected, the purchase-money being the sum of six hundred dollars, no part of which was ever paid by the latter, but who settled it by his mortgage of the lot to Davis, the defendant; the deed bears date the 1st day of January, 1873, but the mortgage is dated on the 5th. After the death of Holmes, viz.: on the 18th day of September, 1874, Davis proceeded upon his mortgage for foreclosure and sale of the lot sold to Holmes, obtained judgment against the representatives of the latter (the administrator, Dr. Strong, being one of the defendants), and issued the writ of *levari facias*, upon which sale was made as aforesaid on the ensuing 7th of April and was bought by Davis. Afterward in the month of August following, the property in dispute here was sold by virtue of an execution in the hands of Sheriff Williamson at the suit of the said George S. Grier against Holmes and was purchased for a nominal sum by said Grier; but it is an undisputed fact that at this latter sale, four months after the sale of the lot by Davis, the property sold was claimed by the plaintiffs as belonging to them and the sale forbidden, and was also claimed by the defendant under his deed from the sheriff of the lot sold under his mortgage, and the sale forbidden also. There was no attempt by Grier to take away the property bought by him. When the sale was over, or at or about the time it was made, formal demand of the delivery of the property was made of the defendant by an agent of the plaintiffs and delivery was refused, and this action of trover was brought for the conversion of it. There can be no mistake about all these facts : they are each and every one of them true, except it may be so far as they depend alone upon the testimony of Grier; and we do not understand that there is any denial of the truth of that part of his testimony above referred to—that is, his communication with the plaintiffs in the treaty of purchase, etc.

From the foregoing statement it results as a consequence that

if the mill in question (and when the term mill alone is mentioned we intend by it not only the saw-mill proper but the engine, boiler, and all the other machinery or apparatus) remained in law the property of the plaintiffs up to the time of the demand of it from Davis (upon whose land therefore, under the circumstances, and in whose custody it was) and his refusal to deliver it up, then the plaintiffs have a clear right of action in the form of trover by them adopted, and are entitled to recover from the defendant by way of damages the value they have proved it to have had at the time of the demand and refusal, with further damages to be added of such sums as shall be equal to the interest on its proved value from the time of the refusal till the rendition of your verdict—provided the aggregate of these sums shall not exceed one thousand seven hundred dollars with interest, which they have announced by their counsel before you to be the limit of their demand. If, on the contrary, you shall be satisfied from the law as we shall announce it to you, and from the facts proved before you, that such property was not owned by the plaintiffs at the time the action was brought, then they are not entitled to recover anything, and your verdict should be simply for the defendant.

We will now proceed, gentlemen, to give you our instructions as to the law which governs this and other like cases, and when you have received them from the court you are to apply it to the facts proved or admitted in the case. And we do not hesitate to say to you, gentlemen of the jury, that we have been very much embarrassed in our minds with respect to the law applicable to this particular controversy, there being two very important points in dispute between the parties, upon one of which, at least, there has never been any statute or judicial decision in this State, and the other has only come up for adjudication upon one occasion. And the embarrassment is the greater because the court is not full—Judge Wootten being absent from sickness in his family—and we have not the benefit of full counsel among ourselves. The duty, however, is upon us to say what we "take the law to be" in this case, and we shall perform it as we best may.

The grounds taken by the learned counsel for the plaintiffs

and which have been presented, as have the opposing views of the defendant's counsel, with ability and fidelity also to their respective clients as well as to the court, are two, chiefly:

First. That the arrangement by which Holmes became possessed of this property was not an absolute sale, but was an executory contract of sale, or at most a conditional sale. Generally in the argument the delivery to Holmes was assumed by the plaintiffs' counsel to be a conditional sale, but in the course of it they sometimes seemed to think it advisable to treat the transaction as an executory contract of sale and relied upon that. To our minds they amount to about the same thing, and in this case justify the plaintiffs, as they conceive in denying that any such act was done on their part or in their behalf as clothed Holmes with any title to the property itself, but simply gave him possession, with the right to become the owner on payment of the purchase-money price, the right and title to it in the meantime remaining in the plaintiffs, which no act of Holmes could deprive them of without their consent.

Second. That although this mill was placed by Holmes upon the lot of ground he purchased of Davis, and notwithstanding the fact, if you should believe under our instructions to you as to the law of fixtures, that it was so attached or fastened to the freehold of the premises as to be a fixture, yet, as it was distinguishable from the rest of the real estate without difficulty, and had passed to the possession of Holmes under what they claim as a conditional sale or executory agreement of sale, it never could, without the plaintiffs' consent, lose its character of personalty and become real property subject to the defendant Davis' mortgage.

We will take up these several points in their order respectively. And with respect to the first we have to say to you that no decision has ever been made by the courts of this State, either under the old system or that under which we are now proceeding, except perhaps the one in Sussex, cited in the third volume of *Houston's Reports* 63, in any respect bearing upon the question of conditional sales or such executory contracts of sale as this is alleged to be by the plaintiffs' counsel. The court is called upon now, for the first time in the history of the State's jurisprudence,

to decide the question whether parties can contract with each other for sale of personal property upon secret conditions between them which will govern the title to that property in whose hands soever the same may go, by the act or in consequence of legal proceedings against the vendee of such property or party with whom the contract of sale may be made, the vendor or contractor being no party to such act of his vendee or contractee nor affected by the legal proceedings against him. In other words, whether in this case the alleged contract between the Watertown Steam Engine Company and Holmes, be it a conditional sale or a contract of sale merely, so impressed itself upon the property in question here as to prevent the latter from making any such disposition of it by the use he applied it to as to subject it to the lien of the mortgage of James B. Davis. Now, treating it, for the sake of the charge we are now making to you, or rather the argument of it, as having been so attached to the freehold as to become a part of it (and whether it was or was not so attached is a question for you when we tell you what is necessary to make such attachment), the question presented is this: Did that property thereby become subject to the lien of Davis' mortgage? The settlement of this question by us necessarily involves the other question—whether conditional sales or agreements for sale with delivery of the property are valid in this State as against subsequent purchasers from or creditors of the conditional purchaser or contractee, because if we should declare such to be the law there would still remain the question, which is a vital one in this case, whether James B. Davis, the defendant, is not to have the benefit as mortgagee of the improvements made to the premises sold by him to Holmes, to secure the whole purchase-money for which he took the mortgage upon which the lot of ground with the machinery upon it was sold. We do not understand the learned counsel on the part of the plaintiffs to deny—in fact, we understand them to admit that if there could in fact, in view of the agreement in this case, have been any such attachment of this mill to the premises as would make it a fixture, and this without knowledge at the time by Davis of the nature of the agreement between the company and Holmes, Davis would not be bound by

that agreement and the machinery would be covered by the lien of his mortgage. This we take to be good law, and we charge you that if you find, upon consideration of the testimony in this case, that Davis was ignorant of the contract between the plaintiffs and Holmes, and if we should instruct you that, notwithstanding that contract, that machinery could be made and was made a fixture on Holmes' premises bought of Davis, then this action will entirely fail and the defendant will be entitled to a verdict. But it is insisted by the plaintiffs' counsel that Davis did know of such contract and therefore he, as mortgagee and purchaser at the sheriff's sale, is affected by it and cannot resist this action, and also that by the terms of that agreement no title passed to Holmes and he could not make a fixture of the property. We are not prepared to adopt the plaintiffs' view in that respect, but, on the contrary, we say to you, not only upon the authority of what we consider as strong cases cited by the defendant's counsel on that very point, but also upon general principles governing all such questions, that the bare fact of knowledge on the part of Davis, the mortgagee, of the contract between the plaintiffs and Holmes without valid legal agreement on his part, founded upon consideration moving from the plaintiffs to him, cannot affect his right—mere notice in such case, if you believe he had it, and it is denied by the defendant's counsel that he had—having no greater effect than in any other case where a mortgagee actually sees permanent erections being made upon the premises he holds in mortgage. The law is without qualification, that a mortgagee or person holding a mortgage on real estate is entitled to the benefits of all improvements made upon it, and we say to you that he cannot be deprived of that benefit without some binding agreement made by him, and such agreement must have all necessary legal requisites in the case of valid contracts. Mere standing by and not dissenting does not constitute assent, even of an implied character, otherwise every mortgagee would be deprived of the benefit of improvements upon mortgaged property which he saw being made. There must, we repeat, be some valid agreement on his part to divest personal property (engine, boiler, mill, and machinery in this case), of its character of real property when it becomes part thereof by attachment to

the reality.   We do not decide that such agreement must be in writing (for though the point was suggested by the learned counsel for the defendant who opened this case, he cited to us no authority for it), but we do say that to deprive him of the benefit to his mortgage of the improvement, he must be shown by proof satisfactory to you to have agreed, upon valuable consideration of some sort, that the property when attached should not be bound by his mortgage.   And we say to you confidently that if you should be of opinion from the proof that the property about which this suit has been tried before you became, under our instruction as to what is necessary for that purpose, a part of the freehold of Holmes' lot without any valid agreement on Davis' part that it should not be bound by his mortgage, then you should give him a verdict.

But the question still remains to be disposed of, for it is that mainly relied upon by the plaintiffs' counsel, although they dwelt at great length and with much force upon the subject of fixtures also, what was the effect of the agreement of the 24th of March, 1875? was it a valid paper or not, and if valid what is its operation in the case before you?

Gentlemen, whatever may be thought of the wisdom or propriety of any statute, rule, or principle of law, when ascertained to exist it must be followed until the General Assembly shall think fit in their wisdom to make a different rule.   As before stated to you, the subject of conditional sales is almost an entirely new one in the jurisprudence of this State; and although most lawyers, ourselves among the rest, have at times found it necessary to reflect upon the subject, yet but very few of us have been aware, until the great industry, research, and exposition of the learned counsel for the plaintiffs, as evinced in this case, made them acquainted with the authorities, how extensively the question has been considered and how uniformly courts have come to about the same conclusion.   The current of authorities is so strong in favor, generally, of the doctrine of conditional sales and their effect that we cannot, if we would, resist its force ; and upon reflection, taken in a proper sense, with such proper restrictions as we think should be placed upon it, it is reasonable enough ; for otherwise no man would be at all safe

in even placing his property, for whatever purpose, in the pos-
session of another. And the case of the. loan of the horse in
Sussex, cited from *Houston's Reports* and that of *Sharp &
Arthurs*, an unpublished decision in Kent, which you have
heard commented upon, both rest upon the ground (for there is
no other for them) that the agreement in each case prevented
the party, as whose property they were levied upon, from
acquiring any ownership in them which could be subjected to
creditors' claims. In fact, there is no principle of law better
settled than that he who has no title in fact cannot convey any
and none can be asserted for him. This is indisputable. Now,
while we do not understand the defendant's counsel as at all
assenting to the doctrine of conditional sales as contended for
to the extent of the views of their opponents, yet they say that
even admitting that they are valid generally yet no weight
should be given to the agreement of sale in this case (that of the
24th of March, 1873) for two reasons : First, because it is not
the agreement on which Holmes acquired the possession of this
property by delivery at the hands of the plaintiffs' agent; and
second, that if it were, still it is not to govern this case, for their
client is not bound by it, he being in no sense a party or assent-
ing to it ; and further, that in consequence of the delay of the
plaintiffs in asserting their claim under it they should be taken
to have waived their rights if they had any. These we under-
stand to be the views insisted on by them, and when we have
delivered to you our opinion upon this point and that of fix-
tures, we shall, we think, have sufficiently answered the prayers
on both sides for instructions. As before said, we hold condi-
tional sales fairly made to be valid in this State; and we decide
and so instruct you, that in this case if there were nothing
appearing to conflict with the effect of the agreement Holmes
acquired no property whatever in the machinery, but was a
mere depository or bailee with a right secured to him to acquire
a title when he paid for it. Such is the fact, although he paid
five hundred dollars in cash and gave his notes for the balance
of the purchase-money, one of which, amounting to a like sum,
was paid also. But in this case it is an undisputed fact that
Holmes bargained for this machinery with the agent (Grier) of

the Watertown Steam Engine Company some time before the agreement was made, and the delivery to him was in pursuance of that bargain. If that bargain was the sale in fact, completed as it was by the payment of the cash and the giving of the notes, then there is an end to this case, for the delivery vested the title to the property in Holmes. Now, whether it was the sale originally depends upon the extent of Grier's authority, and that we must pass upon. It appears by the testimony of Grier, and also by that of Powers, a member of the corporation plaintiff in this suit, that Grier was the company's agent in Delaware for the sale of their machines, and that as such he made the original bargain with Holmes; being such agent, any act done by him in the course of his employment is the same precisely as if done by any other person acting for the plaintiffs. And the plaintiffs, being a corporation or corporate body, having no physical or mental nature, but existing as a body in contemplation of law only, it must necessarily act by agents. Wherever an agency exists it is presumed to be general, or general about the business with which it is concerned, until the contrary appears, and the public is authorized so to regard it. Applying this principle to the case before you, and Grier must be held to have been a general agent in Delaware for the sale of the plaintiffs' machinery unless the contrary appears, and any bargain or arrangement made between him and Holmes consistent with the character of the transaction of sale and the scope of his agency was binding on the company who appointed him. And whenever a person is held out to the world by another as his agent, either generally or in the line of a business in which he may be engaged, the party so representing him to the world is bound by all his acts within the scope of his authority. *Lattomus* v. *The Farmers' Mutual Fire Insurance Company*, 3 *Houst. Rep.* 404.

Now in this case, to avoid the effect of the act of Grier, the agent, evidence has been offered to you and given that he had no authority to sell machines for the company other than upon the terms of cash or notes approved by the company, but we instruct you, gentlemen, that such evidence should have no weight with you in deciding this case unless the fact of such limitation

of authority has been shown by proof of some sort satisfactory to your minds, and that Holmes at the time he acquired possession of this property was aware of such limitation. Has any such been offered? That is for you to say—but we have not heard any. There being then undisputed evidence before you (in fact, it was adduced by the plaintiff himself in his examination of his witness, Grier) that there was an agency in him to sell the machines of the plaintiffs—which includes the making of bargains for them such as men usually make in selling such property, and no disclosure having, so far as appears, been made to Holmes of the secret understanding or arrangement between the plaintiffs and Grier that he was only to sell upon certain terms—we say to you that in our opinion you are justified in holding the plaintiffs bound by the acts of Grier within the line of his employment, and that line must reasonably be taken to be the same as is usual in the case of sales by others of ponderous and highly valuable articles. And, further, it appears by the proof in the cause, as we think, in fact, it has been virtually admitted by the plaintiffs' counsel all through this cause, that Grier knew the object for which the machinery was purchased—its erection upon the freehold estate of Holmes and attachment thereto so far as that was made for the pursuit of a permanent business or manufacture, and not for a mere temporary purpose. The manner in which it was secured to the premises, if the defendant's witnesses are to be believed, shows, it seems to us, a design of fixed employment. If you find that Grier had such knowledge, then in law the company whose agent he was had the same knowledge and is bound by it. This being the case, then the attachment or fixation of the machinery to the freehold (if under our further instruction you shall find it to have been attached or fixed thereto) was with the consent of said company. In fact, the agreement itself shows that the plaintiffs expected its machinery to be erected upon Holmes' freehold, for it was carefully provided that in case of failure to pay any of the notes there should be a right to enter upon such freehold and take it away; and the company of course knew that such machinery could not be used permanently by Holmes without being fastened to his freehold. It cannot

therefore, as we think, be fairly argued that Holmes affixed this property to the freehold and made it a fixture thereof. If you shall find he so made it without the consent of the plaintiffs, and if you adopt these views as your own, then it will follow that the plaintiffs took the risk of all legal consequences resulting from that act, one of which undoubtedly is that the machinery if a fixture became bound by the lien of Davis' mortgage, unless he agreed in some valid manner that it should not. And it would be no valid answer to this to say that the plaintiffs knew nothing about Davis' mortgage, for it is the law that every one must take notice of liens upon real estate at their peril—the public records being open and notice to every one; nor will it do to say that Davis should have communicated the fact of his mortgage even if he knew of the private or secret agreement between the company and Holmes, for he had nothing to do with that unless he consented to it and in some way waived his lien, and the company is to be held to notice of his mortgage. If the bargain by Grier, being that of their agent, is their bargain, then they knew their property was to go upon this freehold and they ought to have been careful either that it should take on no character of a fixture or that Davis should waive or release his mortgage lien. While we give full force to their contract with Holmes so far as these parties are concerned, or *inter se*, we at the same time say to you under the testimony of the facts proved in this cause, if you believe them, that it held good between them alone, and could not affect Davis, the defendant, unless he assented to it by a valid agreement on his part. And with respect to the alleged restriction upon what must otherwise be admitted to have been a general authority in Grier within the scope of his agency to bargain and sell the plaintiffs' machines, you will recollect that proof of such restriction came not from the agent but from a witness interested as a corporator and large stockholder in the company, and who but for a recent act of the General Assembly of this State could not have been a witness at all.

And now as to the question of fixtures : Did the property in this case ever become fixtures in the eye of the law ? It is alleged by the counsel for the plaintiffs that the property in fact

never became fixtures, or a fixture at all, and were therefore never bound by the mortgage of Davis. We have said to you that in our opinion if it became such it was bound by it, unless you believe from the evidence that Davis in some way by a valid agreement consented that it should not be bound by it, but should remain subject to such conditional sale. Well, now, did it become a fixture so as to subject it to liens against the reality in the absence of any agreement on the part of Davis that it should not become so? The law of fixtures in this State came up for decision by this court in the case referred to of *Rice* v. *Adams et al.*, 4 *Harr.* 332, the facts of which were Adams was the owner of a lot in Wilmington, on which he had erected prior to the 1st of January, 1845, a foundry, including a steam engine, boilers, cranes, cupola, etc., all fixed to the premises in the usual way, that is, the engine was put up under a shed outside of the main building, the cranes were bedded in the floor and inserted in the main girder of the house, and the cupola was a large brick chimney running from the ground floor up through the roof of the building. This property was levied on by execution process, and the question was, Was it liable to an execution creditor or not? The court treated this machinery as what they call *real fixtures*, placed upon the premises by the owner of the property and by him attached to the freehold, and adverting to the fact that so placed they were not there for a temporary purpose but as a fixed establishment, they decided that they became part of the freehold premises and were not to be treatead as personal property. This we understand to be the law in relation to fixtures, such as machinery, as well as other articles fixed by the owner of the land to his inheritance. When these are attached to the land by the owner in a permanent manner, and not for a mere transitory purpose, with such circumstances as indicate a purpose or intention on his part to connect them permanently with the soil or buildings upon it in order to the pursuit of a permanent employment or occupation, they cease to have the character of chattels or movable goods, and become part and parcel of the land, just as much as the doors or window-shutters upon the house are, which, though removable in most cases, by simply lifting them from their hinges, are yet as much part of

the land itself as a tree growing upon it or a rock under its surface. And there is no exception to this except in the case of tenants—in whose behalf the law is so far relaxed, and so far only, as to allow them to affix to the dwelling glasses, curtains, and other matters of mere ornament not requiring in their attachment any injury to the house, and (for the benefit of trade) also such chattels, of whatever kind, as are necessary to enable the tenant to prosecute and carry on his trade or occupation if the premises have been rented by him for the pursuit of such business. In such a case all necessary articles, how securely soever fastened by the tenant to the freehold, may be removed by him provided he exercise the right the law gives him to do so before the term expires—for after that he has no rights upon the land. And we say to you, gentlemen, in this case, that if you believe the witnesses for the defendant that the engine and boiler in this case, or either of them, were set upon and fastened to brick walls built into the soil of this lot, as described by them, requiring for such purpose from eight to ten thousand bricks— which could only have been necessary to make a permanent attachment to the freehold—then all the machinery or articles mentioned in the declaration in this case and proved to have been there by the plaintiffs' witnesses became part and parcel of the freehold, or a fixture or fixtures thereof; for it is not necessary in this case, nor is it necessary in any, as the cases cited by the defendant's counsel abundantly show, that every part of the apparatus necessary to the operation of a mill or works should be fastened to the freehold to make it part of a fixture; but if any substantial part of the complete machinery necessary to carry on the business, as in this case the steam saw-mill, consisting of the engine, boiler, sawing-post, smoke-stack, gauges, etc., was fastened in a permanent manner to the freehold, then all is to be considered as so attached, and everything also used in working it. And it makes no sort of difference that the engines, etc., may be lifted off the brick work or otherwise, or unscrewed and separated from the building, for now almost everything in the line of machinery may be detached from the freehold without any very serious injury to it. Whatever may have been the law at one period upon that subject it is not strictly followed

now; and in the case of machinery set upon premises by the owner, as in this case, the question rather is, are the things affixed set or erected or fastened to the freehold for a temporary or permanent purpose? and if the purpose is shown to be permanent, as to carry on an employment or business, or if it be an improvement to the property enhancing its value, it should be treated, especially if the adaptation of the means to the end is shown to be appropriate and fit, as being indicative of a design to incorporate the machinery with the freehold and make it part of it, and as such you should regard it. When the attachment of the chattels is thus complete, so that they become part and parcel of the freehold, like the buildings, the fences, and other improvements of a permanent character, the owner of the land himself cannot detach or remove them and change their character back into personalty to the prejudice of a creditor who has a mortgage upon the premises; for to do so, if the value of the lien of the mortgage should be seriously impaired thereby, would be an act of waste, to prevent the commission of which the mortgagee could obtain relief in equity by injunction or by writ out of the Superior Court.

With this view of the law, gentlemen, you will perceive that this case is narrowed down to the question—Was this steam saw-mill, with its engine, boiler, and all the rest that go to make up the whole, a fixture or not, and if so, did they go upon the premises with the consent of the plaintiffs? This is the question, and having instructed you what a fixture is, if you find the proof to come up to the requirements of the law as we have given it to you—that is, that this property was so attached to the freehold as to become a fixture or fixtures, then your verdict in this case should be for the defendant; but if you find the contrary, that is, that it was not so attached, then you should find for the plaintiffs and give them damages to the amount of the value they have proved their property to have had on the day when the demand upon Davis was made, that is, the 13th day of September, 1875, and interest thereon from that date until the time of the rendition of your verdict, provided the aggregate of the sum does not exceed seventeen hundred dollars and interest, which we understand to be the limit of the plaintiffs' claim.

A few words in relation to the evidence in this case upon the disputed fact of knowledge by Davis of the agreement between the plaintiffs and Holmes before and at the time the machinery was set upon the premises of the latter. There are two witnesses who have testified as to the knowledge by Davis of the character of that transaction—George S. Grier and D. O. G. Strong—but Grier alone speaks of Davis' knowledge at the time of the delivery of the machinery and before it was erected on the premises, Strong speaking only of the conversation between himself and Davis after Holmes' death, which occurred near seven months after the last note fell due. We did not understand Grier to speak of any particular fact establishing Davis' knowledge, but he said they had talked upon the subject of the agreement between the company and Holmes often, and he knew Davis must have been acquainted with it, or words to that effect. And he also testified that before Holmes obtained the property, though after the conveyance of the lot by Davis to him, Davis contemplated becoming a joint purchaser but declined to do so ; we say this was after the conveyance of the lot by him to Holmes, because he said, as Grier states, that he would be one of them if the machinery went upon Holmes' lot. Now, you will have observed, no doubt, that if Grier's testimony that Davis knew of the terms upon which Holmes was to buy is to be taken as true, then we have the singular result that such knowledge was before any terms whatever were required by the company with respect to the delivery of their property to Holmes. Gentlemen, it cannot be that at the time of that delivery, which Grier swears was in the latter part of February or the first of March, Davis had any such notice, for the agreement fixing the terms, and which is the evidence of the existence of them was not sent to Grier to be signed by Holmes until the last of March, that is, the 24th day, and some time after the machinery had been affixed to Holmes' premises. If you understood then as we did the testimony of Grier to assert Davis' knowledge before or at the time the machinery went upon the premises of Holmes, then you must treat it as the result of an error of recollection on his part, just as you must, if you believe the testimony of Benjamin D. Anderson, his

denial that he said in his, Anderson's presence, that one thousand dollars paid to him by Davis would stop his (Grier's) mouth as a witness in this case against him.    Anderson is well known to some of you and is positive in his statement.    It is for you to say which of them, under the circumstances, you think most entitled to your confidence as a witness—the one without any interest whatever so far as anything appears, and the other having certainly made one mistake (with respect to Davis' knowledge of the agreement between the company and Holmes before any such was made or thought of) and being possibly under the influence of the fact, not adverted to, I believe, by the defendant's counsel, but which, however, it is proper you should be reminded of, that he, himself, became the purchaser of this machinery as the property of Holmes at the sheriff's sale made in the fall of 1875.    With respect to the testimony of Dr. Strong, it may be sufficient to state that it is confined entirely to a period after he took out letters upon the estate of Holmes and notice of the proceedings by Davis to foreclose his mortgage was given to him, which by the record in evidence here could not have been before the 23d day of October, 1874, quite nineteen months after the machinery was placed upon the premises of Holmes; and the declaration sworn to by Strong as having then been made by Davis that he didn't think the Watertown Steam Engine Company could hold the property and the notes too, if you believe he made such statement, does not necessarily fix him with notice even then, because it does not appear by any proof that the agreement was shown to him, and he might not have known what the real nature of it was.    In fact, there is no evidence that the paper in proof here was ever shown to Davis or exhibited to any other party, and it is almost certain that Holmes had no duplicate or copy of it, or his administrator, Strong, would most probably have communicated its provisions to Davis and would have so sworn.    We think, therefore, we may fairly say to you that you should consider well the testimony of the plaintiffs' witnesses before you conclude that Davis had notice of the terms upon which the machinery was held by Holmes at the time it became, according to the allegation of the defendant's counsel, a part of Holmes' freehold, and therefore,

14

as they claim, bound by the lien of Davis' mortgage; but if you should upon such consideration believe he had such knowledge then you should give that fact all the weight it is entitled to. But how much weight would it be, in fact, entitled to if fully established in your minds? We know of no rule that would prevent a party holding a mortgage from claiming and being allowed the benefit of any improvements or additions to the freehold upon which his mortgage is a lien, nor of any that requires him to make inquiry to ascertain whether the party making them had the right to do so; on the contrary, the rule as laid down in one of the cases cited in the argument (*Hill* v. *Sewald*, 53 *Penna. State Reports* 274, citing *Gibbons on Fixtures*, 13 *Law Lib.* 2, *p.* 4) is that where the owner of the land wrongfully fixes the chattels of another (as materials in a building) it is a conversion of them into the realty, and by the change of their nature leaves the remedy of the owner only in damages. But if the mortgagee in this case, Davis, did no act which can fairly be taken to have amounted to an agreement on his part that the property placed on the premises by Holmes, that is, the steam mill, should not be bound by his mortgage lien although it might be attached to the freehold, we do not see how the fact of his knowledge even (if such were proved) that Holmes held under a conditional agreement can affect him; for to bind him it ought to have been shown that he was a party to the arrangement and was not to take advantage of it against the Watertown Steam Engine Company. No proof of that kind has been made.

To sum up the whole, gentlemen, in a few words, we instruct you as follows as requested by the plaintiffs, but decline to instruct you as further requested by them, for reasons given in this opinion.

First. That conditional sales of personal property are valid in this State; and where delivery of property is made upon agreement that no title shall pass until payment is made or some other thing is done or occurs, no title passes to the party to whom the property is delivered until such payment is made or other thing is done or occurs; and he can pass none to his vendee, no matter how ignorant of the secret contract such vendee may be.

Second. That if such property consists of machinery which is intended to be placed permanently even upon the purchaser's land and is so placed, yet if its identity can afterward be shown to be that of the property bargained for, the conditional vendor on failure of payment can enter upon the premises and remove it and repossess himself of it, provided such be the bargain between the parties, and can recover a reasonable compensation for the use thereof if such also be the bargain.

Third. That if you believe the testimony, Grier was the agent of the plaintiffs in this State to make bargains and sales of their machines; and that such bargains as he might make, if within the general scope of employment in the case of such agencies, were binding on the company.

Fourth. That if any special agency existed by which Grier was restricted to a certain mode of dealing, such restriction is to have no effect in your decision of this case, unless knowledge of it was communicated to Holmes before he erected the machinery upon his freehold.

Fifth. That knowledge of any such special agency, or of the agreement between the company and Holmes of the 24th of March, 1873, cannot affect the lien of Davis' mortgage, which was recorded before the machinery went upon the premises, unless it can be shown that he in some valid mode agreed that it should be exempted from it, or so conducted himself with respect to the matter as to mislead and deceive the plaintiffs into supposing that his lien would not bind the machinery; for in that case he would have been guilty of fraud, of which, when committed by a party, the law will never allow him to take advantage.

Sixth. That if upon the law as we have announced it to you and the facts in evidence, you are of opinion that the plaintiffs ought to recover from Davis, you should give them a verdict for the value they have proved the property to have had at the time of the execution sale when Grier became the purchaser (which is the time of the demand made) and interest thereon till the date of the rendition of your verdict; if you should, however, upon such law and facts, be of opinion that the plaintiffs ought not to recover from Davis, then your verdict should be for the defendant.